NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

MILES E. JACKSON                          :

              Plaintiff,        :        Hon. Joseph H. Rodriguez

         v.                          :        Civil Action No. 08-6403

GANNETT CO., INC. d/b/a THE     :
DAILY JOURNAL,
                           :        **OPINION**

           Defendants.      :
_____:

**RODRIGUEZ**, Senior District Judge:

This is an employment discrimination suit filed by Miles E. Jackson ("Plaintiff"),
against his former employer, The Daily Journal ("Defendant").   Plaintiff asserts that he
was discriminated against and ultimately terminated based on his disability in violation
of the New Jersey Law Against Discrimination ("NJLAD"), N.J. Stat. Ann. § 10:5-1 et
seq., and the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq.  Defendant
moves for summary judgment pursuant to Fed. R. Civ. P. 56 to dismiss all claims.   Oral
argument was heard on the motion on July 14, 2011.  For the reasons expressed on the
record that day, as well as those set forth below, Defendant's Motion for Summary
Judgment [Dkt. No. 23] will be granted in part and denied in part.

## I.  Background

Defendant is a South Jersey newspaper based in Vineland, New Jersey.  Plaintiff
worked as a Metro Reporter for Defendant from January of 1999 until he was
terminated in May of 2008.  At the time Plaintiff was hired, he advised Defendant in
writing that he was physically disabled due to injuries sustained in a catastrophic motor

vehicle accident in 1988.  As a result of the accident, Plaintiff suffered from limited motion and feeling in his left arm, legs, chronic back pain, development of Hepatitis C due to numerous blood transfusions, and a pituitary disorder requiring the daily use of narcotic medications.  Despite his physical limitations, Plaintiff performed his duties as a Reporter without incident during the first five years of employment with the Daily Journal.

Throughout his career, Plaintiff's medical condition necessitated that he periodically take FMLA leave, and he did so without reproach from Defendant; taking 11 weeks of FMLA leave in 2000, 3 weeks in 2003, and 8 weeks in 2004.  (Pl. Ex. A., Jackson Aff., ¶¶ 19-20.)  Plaintiff's employee evaluation forms indicate that despite his physical limitations and constant pain, he was a tenacious reporter who shunned the thought of the typical nine-to-five work schedule.  (Id. at ¶ 7.)  However, Plaintiff claims that in 2004 the seeds of resentment and intolerance began to grow in his supervisors and he was increasingly subjected to discrimination based on his disabilities.

In 2004, Plaintiff's supervisor, Metro Editor Jason Alt ("Alt") assigned Plaintiff to the only general beat, including in part, the "Court" beat, which required a significant amount of driving.  Around the same time Plaintiff was prescribed a non-narcotic pain medication, Neurontin, in an attempt to wean him off narcotic medications.  After Alt began pointing out mistakes in Plaintiff's work product and placed him on a Performance Improvement Plan, Plaintiff informed Alt that his physical limitations and the medications he was taking prevented him from performing his beat in a satisfactory manner.  (Id. at ¶ 11.)  Plaintiff requested to be reassigned to a less demanding beat

which required less driving, however, Alt refused.  (Id. at ¶¶ 12-13.)  According to

Plaintiff, Alt then began to increase Plaintiff's workload by requiring him to cover last

minute stories and assigning him to simultaneous stories that required significant travel

that made it impossible to complete his stories within the standard work day.  (Id. at ¶

17.)

In 2006, Plaintiff expressed in his Employee Self-Evaluation that his beat was

taking a toll on him:  "As the only reporter with so many different beats, I feel I'm spread

thin.  If this continues, I must make hard decisions and inform my supervisors of what

I'm capable of doing."  (Pl. Ex. G, 2006 Self Evaluation).  From August 31, 2006 through

October 5, 2006, Plaintiff needed to take five weeks of FMLA leave to manage his

disability.  (Id. ¶ 19.)  In 2007, Plaintiff once again asked to be reassigned to a different

beat and his request was denied by Alt.  Tension escalated in the news room as Plaintiff

noticed that his work load appeared to continue to grow while other reporters, such as

Tim Zatzariny and James Quaranta, were assigned to beats that never required excessive

hours, seemingly because they were favored by Alt.  (Id. at ¶ 28.)

In July of 2007, Plaintiff was given a last minute assignment by Assistant Metro

Editor, Thomas Frasier ("Frasier") at 4:30 p.m.  (Id. at ¶ 34.)  Plaintiff objected to the

last minute assignment and indicated that he had a previously scheduled religious

meeting to attend that evening.  (Id.)  Frasier directed Plaintiff into a back room and

began to yell at him.  The altercation escalated and Plaintiff alleges that Frasier cursed at

him and grabbed his wrist when he attempted to leave the room.  Although Plaintiff

stayed past 5:00 p.m to finish the assignment, he submitted an informal letter to

Defendant, detailing the events that transpired and expressing concern that he would be subjected to retribution from Frasier as a result of the altercation.  (Pl. Ex. T.)

Shortly after the incident with Frasier, in August of 2007, Plaintiff submitted a note from his doctor that provided: "Because of his medical problems he should not work more than 40 hours a week and no more than 8 hours any day."  (Def. Ex. J., August 30, 2007 Note of Dr. Haag).  In a seeming attempt to comply with the mandates of the note, Defendant directed Plaintiff to tell his supervisors if he was approaching the hourly limitation set by his doctor and was required to log his hours on a daily basis so that his supervisors could track his progress.  (Pl. Ex. S, November 2, 2007 Memo from Charlie Nutt to Plaintiff.)  During this time period, Alt continued to pile work on Plaintiff, such that he was unable to accomplish the ever increasing number of tasks within the eight-hour time limitation.  (Jackson Aff., ¶¶ 36-38.)  In addition, Alt heightened his scrutiny of Plaintiff's work product and placed him on a Performance Improvement Plan in January of 2008.  (Id. at ¶ 39; Def. Ex. I, January 21, 2008 Performance Improvement Plan.)

On February 18, 2008, Plaintiff submitted a request for FMLA leave due to: "mental breakdown - job related stress."  (Def. Ex. E.)  Plaintiff was out of work for twelve weeks on FMLA leave until he attempted to return to work on May 5, 2008 with a note from his doctor, requesting that Defendant "please limit his work schedule to a maximum of 8 hours a day and 40 hours a week."  (Pl. Ex. B, May 5, 2008 Medical Note of Dr. Haag).  Defendant required that Plaintiff's note specifically clear him to drive. Plaintiff then produced a second physician's note, stating: "This is to advise you that I

have released the above named to drive and to return to work on a full time basis within the medical doctor's restrictions of eight hour days and forty hour weeks." (Pl. Ex. B, May 7, 2008 Note of Dr. Crouse.) Plaintiff was informed by Defendant that he was required to return to work with no restrictions on his job duties and, when Plaintiff failed to do so, he was terminated. Defendant contends that the previous efforts to limit Plaintiff's hours to no more than eight hours a day proved to be an "unworkable accommodation" for his position as a Reporter at the Daily Journal. (Alt Tr., 75:10-16.) According to Plaintiff, the true reason Defendant took such a hardline stance on Plaintiff's hour restriction was because Defendant no longer wished to "repeatedly accommodate" Plaintiff's FMLA leave requests.

Plaintiff filed a five-count Complaint in New Jersey Superior Court, Cumberland County, on November 28, 2008. Plaintiff alleges that he was subjected to a hostile work environment because of his disability and retaliated against when he complained of harassing behavior. Plaintiff also alleges that he was denied a reasonable accommodation and ultimately terminated because of Defendant's allegedly unreasonable position that Plaintiff, as a reporter, must be available to work greater than eight hours a day. Plaintiff further alleges that Defendant interfered with his right to take FMLA leave and terminated him in retaliation for exercising his FMLA rights in 2008. Lastly, Plaintiff asserts that he is entitled to punitive damages because Defendant engaged in discriminatory practices with malice or reckless indifference to his rights under the NJLAD and FMLA. Defendant timely removed the matter to this Court on December 31, 2008 and now seeks summary judgment in its favor, dismissing all claims.

## II.  Summary Judgment Standard

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56 (a).  The Court will enter summary judgment in favor of a movant who shows that it is entitled to judgment as a matter of law, and supports the showing that there is no genuine dispute as to any material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56 (c)(1)(A).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.;

Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994).  Thus, to

withstand a properly supported motion for summary judgment, the nonmoving party

must identify specific facts and affirmative evidence that contradict those offered by the

moving party.  Andersen, 477 U.S. at 256-57.  "A nonmoving party may not 'rest upon

mere allegations, general denials or . . . vague statements . . . .'" Trap Rock Indus., Inc. v.

Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting

Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)).  Indeed,

> the plain language of Rule 56(c) mandates the entry of summary
> judgment, after adequate time for discovery and upon motion, against a
> party who fails to make a showing sufficient to establish the existence of an
> element essential to that party's case, and on which that party will bear the
> burden of proof at trial.

Celotex, 477 U.S. at 322.  That is, the movant can support the assertion that a fact cannot

be genuinely disputed by showing that "an adverse party cannot produce admissible

evidence to support the [alleged dispute of] fact."  Fed. R. Civ. P. 56(c)(1)(B); accord

Fed. R. Civ. P. 56(c)(2).

    In deciding the merits of a party's motion for summary judgment, the court's role

is not to evaluate the evidence and decide the truth of the matter, but to determine

whether there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

249 (1986).  Credibility determinations are the province of the factfinder.  Big Apple

BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

    In employment discrimination cases, the burden of persuasion on summary

judgment remains unalterably with the employer as movant.  The employer must

persuade the court that even if all of the inferences which could reasonably be drawn

from the evidentiary materials of record were viewed in the light most favorable to the plaintiff, no reasonable jury could find in the plaintiff's favor.  <u>Doe v. C.A.R.S.</u>, 527 F.3d 358, 362 (3d Cir. 2008).

## III.  Discussion

### A.  The New Jersey Law Against Discrimination Claims

Plaintiff alleges four counts of discrimination under the NJLAD, which prohibits "any unlawful discrimination against any person because such person is or has been at any time disabled or any unlawful employment practice against such person, unless the nature and extent of the disability reasonably precludes the performance of the particular employment."  N.J. Stat. Ann. § 10:5-4.1.  Analysis of claims made pursuant to the NJLAD generally follow the analysis used in Title VII claims, <u>Schurr v. Resorts Int'l Hotel, Inc.</u>, 196 F.3d 486, 498 (3d Cir. 1999), and New Jersey courts employ the three-step burden shifting standard articulated in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 801-04 (1973).  <u>See</u> <u>Zive v. Stanley Roberts, Inc.</u> 867 A.2d 1133, 1139 (N.J. 2005). First, the plaintiff bears the initial burden of establishing a *prima facie* case of unlawful discrimination.  <u>Id.</u>  If the plaintiff is successful in establishing a prima facie case, the defendant must articulate a legitimate, nondiscriminatory reason for the adverse employment action.  <u>Id.</u>  Where defendant satisfies this burden, the plaintiff must prove, by a preponderance of the evidence, that the defendant's proffered reason was merely a pretext for discrimination.  <u>Id.</u> at 1140.

8

## 1.    Hostile Work Environment

Count One alleges that Plaintiff was subjected to a hostile work environment due to his various encounters with supervisors from September 2005 through January of 2008.  (Compl., ¶¶ 29-32.)

To state a *prima facie* hostile work environment claim under the NJLAD, a plaintiff must show that the complained of conduct: "(1) would not have occurred but for the employee's protected status, and was (2) severe or pervasive enough to make a (3) reasonable person believe that (4) the conditions of employment have been altered and the working environment is hostile or abusive."  Shepherd v. Hunterdon Dev. Ctr., 803 A.2d 445, 453 (N.J. 1993) (citing Lehmann v. Toys 'R' Us., Inc., 626 A.2d 445, 453 (N.J. 1993)).  A viable hostile environment claim stems from extremely insensitive conduct against the protected person so egregious that it alters the conditions of employment and destroys the person's equal opportunity in the workplace.  See DeAngelis v. El Paso Municipal Police Officers Ass'n, 51 F.3d 591 (5th Cir.), cert. denied 516 U.S. 974 (1995).

With regard to hostile work environment claims, the New Jersey Supreme Court adopted the "severe or pervasive" test as part of its comprehensive standard, which "conforms to the standard for establishing workplace racial or gender harassment under federal Title VII law."  Taylor v. Metzger, 706 A.2d 685, 689 (N.J. 1998) (citations omitted).  That is, in order for harassment to be cognizable, it must be "'sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an

abusive working environment.'" <u>West v. Philadelphia Elec. Co.</u>, 45 F.3d 744, 753 (3d Cir. 1999)(quoting <u>Meritor Savings Bank, FSB v. Vinson</u>, 477 U.S. 57, 67 (1986)).

Courts must consider the frequency or severity of the conduct, whether the conduct was physically threatening or humiliating, or merely an offensive utterance and whether the conduct unreasonably interfered with plaintiff's work performance.  <u>See Godfrey v. Princeton Theological Seminary</u>, 952 A.2d 1034, 1045 (N.J. 2008)).  However, the focus must be on the harassing conduct itself, "not its effect on the plaintiff or the work environment; that is because neither a plaintiff's subjective response to the harassment nor a defendant's subjective intent when perpetrating the harassment is controlling of whether an actionable hostile environment claim exists." <u>Cutler v. Dorn</u>, 955 A.2d 917, 924 (N.J. 2008) (internal citations and quotation marks omitted).  Thus, plaintiffs must realize that "not everything that makes an employee unhappy" forms the basis for an actionable hostile work environment claim.  <u>Robinson v. City of Pittsburgh</u>, 120 F.3d 1286 (3d Cir. 1997) (citations omitted).

Plaintiff supports his hostile work claim generally with vague references to disparaging comments, unfounded criticism and a sense of hostility he received from his supervisors.  Primarily, Plaintiff relies on the physical altercation with Frasier, the piling up of assignments by Alt and Frasier, and the scrutiny and perceived nit-picking of his work product.  However, Plaintiff has failed to establish that any of this allegedly hostile behavior was causally related to his disability.

First, Plaintiff points to the physical altercation with Frasier occurring in June of 2007 as proof of a hostile environment.  However, the August 23, 2007 letter Plaintiff

submitted to Defendant regarding the altercation does not evidence concern that

Frasier's behavior occurred because of Plaintiff's disability.  Rather, the letter repeatedly

begrudges Frasier's failure to accommodate Plaintiff's domestic situation and after work

religious observations by giving him last minute assignments:

> As far as forced overtime, I always finish jobs that I have started and
> always step up to the plate when help is needed.  But I do not feel it is my
> duty to take on additional work after I already have put in 8 hours.  I have
> been a hard worker who rarely, if ever refused work even if given to me at
> the end of the day.  But I do have the right to a home life.
>
> ***
>
> I had promised my wife I would be home early to help out with a religious
> meeting we have at our house from time to time.  It was the first time I had
> left early in weeks, even after starting at 9 a.m. on a regular basis.  It is a
> source of much frustration that, when I do ask for a little consideration the
> answer is usually no.
>
> I also was "why do you have to leave?" When I informed my supervisor
> about leaving at 5 p.m. I don't feel that's anybody's business, especially
> since my religious beliefs have been the subject of some ridicule during the
> past few years.

(Pl. Ex. T.)  Therefore, because there is no evidence that Frasier targeted Plaintiff

because of his disability, the altercation with Frasier is insufficient to establish a hostile

work environment.

Next, Plaintiff takes issue with the fact that Alt routinely gave him more

assignments, knowing that he would be unable to finish them in a timely manner.

However, as early as 2005, Plaintiff indicated: "I am given additional work because my

immediate supervisors know it will be done.  I do work without being told because I

have pride in what I consider to be, at least in part, my newspaper." (Pl. Ex. J., June 18,

2005 Employee Self-Evaluation.)  Nowhere does Plaintiff establish that the perceived

increase in his work load was the result of discriminatory animus on behalf of Alt.[1] While certainly this type of behavior was not ideal for Plaintiff and arguably unfair, it is not the type of behavior that typifies a hostile work environment under the NJLAD.

Plaintiff also makes repeated reference to the distribution of beats as creating a hostile work environment. In a memo sent to Alt in November of 2007, Plaintiff expressed his concern with what he perceived to be the unequal assignment of beats and his desire to be switched to a beat that required less travel. (Pl. Ex. Q., November 7, 2007 Letter.) Plaintiff explains that his requests for reassignment to another beat was denied because Alt simply favored other reporters:

> I had previously requested the Vineland beat and was denied that beat. I suspected that my request would be denied because Alt favored Tim Zatzariny, who had been assigned the beat for ages and was given this beat because it was his desired beat. Alt also favored James Quaranta, who had been assigned the "cops" or "public safety" beat for ages as well, and who was also a favored reporter of Alt.

(Jackson Aff., ¶ 28.) In essence, Plaintiff asserts that Alt created a hostile work environment for Plaintiff by giving Zatzariny and Quaranta the "choice" beat assignments despite Plaintiff's repeated reassignment requests. However, Plaintiff does not indicate that this perceived favoritism is based on disability discrimination.

---

[1]    Plaintiff makes passing reference to a November 5, 2007 email, in which Alt indicates to Frasier that he was assigning Plaintiff to the "County" beat to "put him in a better mood" but "that if he has outbursts towards the metro editors that I consider inappropriate, I will take him off the beat as punishment." (Pl. Ex. R., Alt Reassignment Emails). Plaintiff seems to assert that this sentence is telling of Alt's desire to punish Plaintiff for requesting accommodation of his difficulty. However, the statement clearly indicates that Alt's concern is directed towards Plaintiff's inappropriate behavior towards staff rather than his disability or requests to accommodate his disability.

Therefore, again, Plaintiff is unable to establish that the allegedly offensive conduct would not have occurred but for his protected status.

Plaintiff also points to what he perceives to be the merciless scrutiny of his work product.  However, in his 2006 Employee Self-Evaluation, Plaintiff acknowledged the legitimacy of Alt's critiques of his work product:

> Although I have made improvements in my attention to detail, I still as Jason Alt says, need to take ownership of every stroke of my keyboard.  It is something that detracts from my credibility and, more importantly, the credibility of the newspaper.
>
> I also have come to terms with my supervisors and the realities of the newspaper business.  I must keep my views where they belong and not express them in the newsroom where they can have a detrimental effect on morale.

(Pl. Ex. G.)  Although Plaintiff stood out as a creative and tenacious reporter, his employee evaluations throughout the course of his employment document a need to improve accuracy and decrease errors.  (Pl. Exs. H-L.)  Some of the alleged errors pointed out by Alt may have been unnecessary, incorrect, or trivial.  However, the evidence presented demonstrates that this perceived nit-picking was nothing more than Alt performing his job as an editor.

In short, Plaintiff does not establish that the complained of behavior would not have occurred but for Plaintiff's protected status.  Nowhere does Plaintiff provide evidence, rather than vague accusations, that he was singled out, harassed or maligned because of his disability.  Plaintiff's testimony and written complaints document that he was assigned additional work because of his willingness to perform the work and that his disfavored beat assignment was the unfortunate product of Alt's favoritism towards

other reporters.  Further, the unpleasantries and general feelings of tension Plaintiff

describes hardly rise to the level of severe or pervasive conduct that would have altered

Plaintiff's employment conditions necessary to sustain a hostile work environment

claim.  See Robinson, 120 F.3d at 1286.  Therefore, summary judgment is granted with

respect to Plaintiff's hostile work environment claim.

### 2.  Retaliation

Count Three alleges that Plaintiff was maliciously and intentionally retaliated

against because he complained to Defendant that he was being discriminated against

and harassed based on his disability.  (Compl., ¶¶ 40-41.)

The NJLAD provides that it is unlawful for an employer "to take reprisals against

any person because that person has opposed any practices or acts forbidden under this

Act."  N.J. Stat. Ann. 10:5-12(d).  To establish a *prima facie* retaliation under the

NJLAD, a plaintiff must demonstrate: (1) that he engaged in protected activity known to

the employer; (2) he was thereafter subjected to an adverse employment consequence;

and (3) there is a causal connection between the protected activity and the adverse

employment consequence.  Victor v. State, 4 A.3d 126, 141 (N.J. 2010); Tartaglia v. UBS

PaineWebber, Inc., 961 A.2d 1167, 1192 (N.J. 2008).

An employee engages in protected activity under the NJLAD when he or she

opposes or challenges any practice or acts rendered unlawful under the statute.  Young

v. Hobart W. Grp., 897 A.2d 1063, 1073 (N.J. Super. App. Div. 2005).  Thus, the

protected activity must involve a complaint of prohibited discrimination.  General

complaints of unfair treatment, outbursts and harsh treatment unrelated to disability are not sufficient to establish protected activity. See Barber v. CSX Distribution Servs., 68 F.3d 694, 702 (3d Cir. 1995); Reyes v. McDonald Pontiac–GMC Truck, 997 F.Supp. 614, 619 (D.N.J. 1998).

To constitute an adverse employment action under the NJLAD, the retaliatory conduct "must be serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." Robinson v. City of Pittsburg, 120 F.3d at 1300. Importantly, "not everything that makes an employee unhappy qualifies as retaliation, for otherwise, minor and even trivial employment actions that an irritable chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." Id.

Defendant first argues that Plaintiff cannot satisfy the first element of a *prima facie* case of retaliation because he did not engage in protected activity. In support of his claim, Plaintiff asserts that he engaged in protected activity when he repeatedly complained about his workload and requested to be transferred to what he perceived to be less-demanding beats. However, these generalized complaints of unfair treatment are insufficient to establish protected activity.

The only activity Plaintiff engaged in that could be construed as protected activity is when Plaintiff complained to Human Resources that Alt was harassing him by failing to provide him with the requested keyboard tray when Alt informed Plaintiff that he would not turn it over until Plaintiff cleaned off his desk. (Jackson Tr., 140:16-142-6.) The record is not clear as to exactly what concerns Plaintiff voiced about Alt's failure to

15

timely provide the keyboard tray other than that he complained about "everything that had been happening, some comments [Alt] had been making, and the – you know, just the general harassment I felt had been going on." (Jackson Tr., 141:16-18.)  Therefore, it is not entirely clear whether Plaintiff's complaint was that he was frustrated with what he perceived to be Alt's harassment or insensitivity towards his disability or whether he was complaining that Alt was being unreasonable by making him clean his desk.

Even assuming Plaintiff's complaint raised concerns about disability harassment, Plaintiff fails to establish that he was subjected to an adverse employment action in retaliation.  Plaintiff merely asserts that after his complaint, he was subjected to increased hostility and scrutiny of his work product by Alt and Frasier.  These vague and generalized grievances are the type of trivial employment actions that do not rise to the level of seriousness to alter Plaintiff's compensation, terms, conditions, or privileges of his employment.  Robinson, 120 F.3d at 1300.  Therefore, summary judgment will be granted with respect to Plaintiff's NJLAD retaliation claim.[2]

### 3.  Failure to Accommodate and Termination

Count Two alleges that Defendant discriminated against Plaintiff by failing to make reasonable accommodations or to consider the possibility of reasonable accommodations prior to taking adverse employment actions against Plaintiff.  (Compl.,

---

[2]      To the extent that Plaintiff's NJLAD retaliation claim could be construed to assert that Plaintiff was terminated in May of 2008 in retaliation for complaining about Alt's failure to deliver the keyboard tray in April of 2007, summary judgment is likewise appropriate on the grounds that Plaintiff has not establish a causal connection between the arguably protected activity and the subsequent adverse employment action taking place over one year later.

¶¶ 34-35).  In Count Four, Plaintiff alleges that he was ultimately terminated because of his disability.  (Compl., ¶¶ 43-46.)

An employer "must make a reasonable accommodation to the limitations of an employee or applicant who is a person with a disability, unless the employer can demonstrate that the accommodation would impose an undue hardship."  N.J. Admin. Code tit. 13, § 13-2.5.  This duty to accommodate, however, is subject to an exception, "where it can reasonably be determined that an . . . employee, as a result of the individual disability, cannot presently perform the job even with reasonable accommodation."  N.J. Admin. Code tit. 13, § 13-2.8(a).  Thus, to assert a *prima facie* case of disability discrimination in the form of failure to accommodate or discriminatory termination, the plaintiff must demonstrate that he was otherwise qualified to perform the essential functions of the job, either with or without accommodation.  See Victor, 4 A.3d at 142 (citing Clowes v. Terminix Int'l, Inc., 538 A.2d 794, 805-06 (N.J. 1988)).

Defendant does not challenge that Plaintiff is disabled under the NJLAD or that he sought an accommodation prior to his termination.[3]  For the purposes of this motion,

---

[3]        The only requested accommodation before the Court is Plaintiff's request to have his schedule limited to eight hours a day and forty hours a week.  Plaintiff makes passing reference to requests for accommodation "through use of flexible aspects of work," such as reassignment to the allegedly less strenuous beats covered by Tim Zatzariny and James Quaranta or through "the provision of a laptop or other inexpensive information technology to be used away from the work site to transmit typed stories or information to editors."  (Pl.'s Opp., p. 5.)  However, it is well established that for reassignment to be a reasonable accommodation, the position must be both funded and vacant.  Donahue v. Consol. Rail Corp., 224 F.3d 226, 234 (3d Cir.2000).  "An employer is not required to 'bump' another employee in order to reassign a disabled employee to that position."  Cravens v. Blue Cross & Blue Shield of Kansas City, 214 F.3d 1011, 1019 (8th Cir.2000).  Therefore, Plaintiff's subjective feeling that it would be reasonable to reassign beats to accommodate his request is without

Defendant only challenges Plaintiff's ability to satisfy the requirement that he was qualified to perform the essential functions of his position. (Def.'s Br., p. 27.)  According to Defendant, being available to work eight hours a day is an essential function of Plaintiff's position and, therefore, he cannot establish a *prima facie* case of disability discrimination.  (Id.)

Although the NJLAD does not define what constitutes an essential job function, the ADA's implementing regulations offer guidance and provide that the "essential functions" of an employee's position are the "fundamental job duties," as opposed to merely "marginal functions."  29 C.F.R. § 1630.2(n)(1).  A job function may be considered essential if (1) "the reason the position exists is to perform that function," (2) only a limited number of employees are available "among whom the performance of that job function can be distributed," or (3) the function is "highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function."  29 C.F.R. § 1630.2(n)(2).  Evidence that a job function is essential includes:

---

consequence to his failure to accommodate claim.  Further, although Plaintiff provides no evidence that he requested a laptop as an accommodation, his January 21, 2008 Performance Evaluation Plan clearly indicates that a laptop was provided to Plaintiff to help him finish his work within the eight-hour limitation:

> A laptop has been provided to you for use when you are out on assignment and you have not been using it. . . The laptop is for your convenience so that you don't run back and forth to assignment and so that you can file your stories.  It is imperative that you use your laptop in order to file the stories on time and to keep your work hours to a maximum of 8 hours a day as prescribed by your doctor.

(Def. Ex. I.)

(i)    The employer's judgment as to which functions are essential;

(ii)   Written job descriptions prepared before advertising or interviewing applicants for the job;

(iii)  The amount of time spent on the job performing the function;

(iv)   The consequences of not requiring the incumbent to perform the function;

(v)    The terms of a collective bargaining agreement;

(vi)   The work experience of past incumbents in the job; and/or

(vii)  The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3).

Whether a particular job function is essential is ultimately a factual determination that must be made on a case by case basis based upon all relevant evidence. Supinski v. United Parcel Service, Inc., 413 Fed. App'x 536, 540 (3d Cir. 2011); Turner v. Hershey Chocolate USA, 440 F.3d 604, 612 (3d Cir. 2006). "Although the burden is on the plaintiff to show, as part of his prima facie case, that he is a qualified individual, the employer 'has the burden of showing a particular job function is an essential function of the job.'" Supinski, 413 Fed. App'x at 540 (citing Rehrs v. Iams Co., 486 F.3d 353, 356 (8th Cir.2007); Ward v. Mass. Health Research Inst., Inc., 209 F.3d 29, 35 (1st Cir.2000)) (internal quotations omitted); see also 29 C.F.R. pt. 1630, app. § 1630.2(n) (noting that while "the inquiry into essential functions is not intended to second guess an employer's business judgment with regard to production standards," the employer "will have to show that it actually imposes such requirements on its employees in fact, and not simply on paper"). Therefore, the Court may grant summary judgment in Defendant's favor only if a reasonable juror "could not but find" that being able to work in excess of eight hours a day and forty hours a week was an essential

19

function for a reporter at the Daily Journal.  See Supinski, 413 Fed. App'x at 540;

Turner, 440 F.3d at 612.

Defendant contends that newsworthy events do not always happen on a set

schedule and reporters are sometimes required to work long days.  According to

Defendant, the necessity for a reporter to be able to work flexible hours is evidenced by

Defendant's Employee Handbook which provides as follows:

> The normal workweek for most full-time non exempt employees is
> Monday through Friday from (8:30 a.m. until 5:00 p.m.), with one hour
> for lunch.  Some staff members work other schedules, however, depending
> upon work requirements.  Your supervisor will inform you of your regular
> working schedule.  *Flexibility is important.  In some cases, it may be
> necessary to adjust your work schedule based on business need.*

(Pl. Ex. D, Employee Handbook, p. 23.)  Defendant argues that during his employment

as a Reporter, Plaintiff regularly worked well in excess of 40 hours per week.  (Jackson

Tr., 52:8-13.)

Plaintiff concedes that the nature of the hours he worked throughout his career as

a Reporter could not be characterized as the traditional nine to five job:

Q:    How many hours a week were you working back in 2004?
A:    50 to 60 hours a week.  Fifty to 55, 57 hours a week.  Over 50 hours a
      week.
Q:    And then how long did that type of schedule continue?
A:    During the entire time I worked at the Daily Journal, I don't think
      there was any period of time where I worked 40 hours a week or less
      for an extended period of time.

* * *

Q:    Isn't that the nature of a reporter's job that sometimes you have to
      work long hours?

A:      Sometimes, yes.

Q:      And as I understand it, the news doesn't always happen at the time
        that you want it to; is that correct?

A:      That's correct

(Jackson Tr., 52:4-13; 53:5-11.)  However, Plaintiff argues that because he "happened to

be a particularly productive and resourceful news paper reporter capable, for years, to

handle the beats he was assigned by working long hours, is not truly indicative of the

function of a news paper reporter position at the Daily Journal." (Opp. P. 14.)  Plaintiff

argues that even though he often worked more than eight hour days and forty hour

weeks, this workload was not essential to perform the job of a Reporter at the Daily

Journal.  Rather, Plaintiff argues that the number of hours he worked was a direct result

of the uneven workload he was given, specifically.  (Jackson Aff., ¶ 9.)

        Plaintiff points out, importantly, that a number of other reporters *never* worked

any overtime.  (Pl.'s Br., p. 5.)  Specifically, Plaintiff provides time sheets from 2007 that

indicate three of the other Metro Reporters never worked any overtime, including Tim

Zatzariny and James Quaranta.  (Pl.'s Ex. O.)  Defendant argues that comparison to the

hours worked by other reporters is inconsequential because Plaintiff admits his

particular beat required overtime.  (Def.'s Reply Br., p. 7.)  Although Defendant argues

that the Court should not consider the limited hours worked by Zatzariny and Quaranta,

Defendant directs the Court to consider that three other Metro Reporters frequently

worked overtime as support for the conclusion that reporters are required to be able to

work in excess of eight hours.  (Def.'s Reply Br.. pp. 2-3.)  However, Defendant's

argument that reporters *must* be available to work in excess of eight hours is seriously

undermined by the fact that some of Defendant's reporters never actually worked overtime.  There is no dispute that flexibility is an essential aspect of a reporter's ability to effectively report on the news, as evidenced by the Employee Handbook.  There is also no dispute that Plaintiff routinely worked in excess of eight hours a day during his career as a reporter for the Daily Journal.  However, the time sheets provided raise a genuine issue with respect to whether or not Defendant actually imposed such flexibility requirements on all of its reporters in fact, rather than selectively on Plaintiff.

Therefore, genuine questions of fact remain with respect to whether or not Plaintiff's requested accommodation of working only eight hours a day and forty hours a week would have prevented him from performing the essential functions of his job.  Because the reasonableness of a particular accommodation is generally a question of fact and because Defendant has not demonstrated that it is entitled to judgment as a matter of law with respect to the necessity that Plaintiff work in excess of eight hours, Defendant's motion for summary judgment will be denied with respect to Plaintiff's failure to accommodate claim (Count Two) and termination claim (Count Four).

### B.  Count Five - FMLA Claims

In Count Five, Plaintiff alleges that Defendant interfered with his rights under the FMLA by denying him intermittent leave when he sought to return to work on May 8, 2008 and failing to counsel him with regard to his rights under the FMLA.  (Compl., ¶¶ 49, 50.)  Plaintiff also alleges that Defendant terminated him in retaliation for exercising his rights under the FMLA.  (Compl., ¶ 51.)

The purposes of the FMLA are to "balance the demands of the workplace with the needs of families" and "to entitle employees to take reasonable leave for medical reasons." 29 U.S.C. § 2601(b)(1)-(2). To those ends, the FMLA provides that "an eligible employee shall be entitled to a total of twelve workweeks of leave during any twelve month period" if the employee has a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). The FMLA prohibits an employer from interfering with, restraining, or denying the exercise of an employee's FMLA rights. 29 U.S.C. § 2615(a)(1). In addition, the FMLA prohibits an employer from retaliating against employees who exercise their rights under the Act. 29 U.S.C. § 2615(a)(2). Thus, a plaintiff may assert an FMLA violation under either an "interference" theory or a "retaliation" theory. Here, Plaintiff alleges both interference and retaliation claims.

### 1. FMLA Interference

To succeed on an interference claim, an employee must demonstrate that he was entitled to FMLA benefits and that his employer illegitimately prevented him from exercising him in a meaningful way. Sarnowski v. Air Brooke Limousine, Inc., 510 F.3d 398, 401 (3d Cir.2007); Conoshenti v. Public Service Elec. & Gas Co., 364 F.3d 135, 143 (3d Cir. 2004).

Defendant moves for summary judgment on the grounds that Plaintiff was afforded the full twelve weeks of leave he was entitled to under the FMLA and there is no evidence that Defendant denied or interfered with Plaintiff's ability to take FMLA leave. (Def.'s Br., pp. 27-28.) Plaintiff has withdrawn his FMLA claim that Defendant

failed and/or refused to counsel Plaintiff regarding his rights under the FMLA.  (Pl.'s

Br., p. 34.)  Further, there is no evidence that Defendant interfered with Plaintiff's

attempts to exercise his FMLA rights.  When asked about his FMLA claims, Plaintiff

testified as follows:

> Q:  Now, every single time you asked for Family and Medical Leave Act
> Leave, you did receive it; is that correct?
> A: Yes

(Jackson Tr., 170:22-25.)  Therefore, Defendants motion will be granted with respect to

Plaintiff's FMLA interference claim.

### 2.  FMLA Retaliation

To establish a *prima facie* claim of retaliation for taking FMLA leave, a plaintiff

must show that: (1) he asserted FMLA rights; (2) he thereafter suffered an adverse

employment decision; and (3) the adverse decision was causally related to the leave.

Erdman v. Nationwide Ins. Co., 582 F.3d 500, 508-09 (3d Cir. 2009); Cognoscenti, 364

at 146.  Courts apply the McDonnell Douglas burden-shifting framework when analyzing

retaliation claims.  Weston v. Pennsylvania, 251 F.3d 420, 432 (3d Cir. 2001).  Once the

plaintiff establishes a *prima facie* case, the burden of persuasion shifts back to the

defendant to put forth a legitimate, nondiscriminatory reason for the employment

decision.  Id.  If the defendant succeeds in demonstrating that the decision was based on

a non-discriminatory reason, the plaintiff has the burden of proving by a preponderance

of the evidence that the stated reason was merely pretext.  Id.

Courts focus on two main factors when determining whether the causal link

necessary for retaliation exists: timing and evidence of ongoing antagonism.  Farrell v.

Planters Lifesavers Co., 206 F.3d 271, 281 (3d Cir. 2000).  A plaintiff may not ordinarily satisfy his burden of proving causation simply by noting that the adverse employment action occurred after engaging in protected conduct.  Robinson, 120 F.3d at 1302. However, when there is an extreme temporal proximity between the protected activity and adverse employment action, courts are likely to find sufficient evidence to support a *prima facie* case of retaliation.  See, e.g., Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989).

In the absence of direct evidence of discrimination, "the proper inquiry is 'whether evidence of inconsistencies and implausibilities in the employer's proffered reasons for discharge reasonably <u>could</u> support an inference that the employer did not act for non-discriminatory reasons, not whether the evidence <u>necessarily</u> leads to [the] conclusion that the employer did act for discriminatory reasons.'"  Josey v. John R. Hollingsworth, Corp., 996 F.2d 632, 638 (3d Cir. 1993) (quoting Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 900 (3d Cir. 1987) (further citation omitted)).  Thus, the timing of an employee's termination may be used to raise an inference that his employer's purported non-discriminatory reasons for dismissal are merely pretextual and, therefore, raise a genuine issue of material fact precluding summary judgment.  See LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 233 (3d Cir. 2007).

As an initial matter, Plaintiff properly argues that Defendant does not challenge the retaliation claim in its initial moving papers.  (Pl.'s Br., p. 36.)  However, Defendant argues in its reply brief that "the discharge was based upon Plaintiff's inability to return to work and perform essential functions of his position."  (Def.'s Reply Br., p. 5.)

According to Defendant, "Plaintiff had taken many leaves over the years.  If Defendant was the type of employer that discriminates against an employee who takes FMLA, Plaintiff would have been terminated long before May 2008."  (Id. at p. 15.)  Even if the Court was to accept Defendant's proffered explanation, the extreme temporal proximity between Plaintiff's final FMLA leave and his termination raises the inference of pretext.  See LeBoon, 503 F.3d at 233.

A reasonable fact finder could conclude that Plaintiff was terminated because Defendant was tired of "repeatedly accommodating" his protected FMLA leaves of absence.  Because genuine issues of material fact exist as to whether Plaintiff was terminated in retaliation for taking FMLA leave, summary judgment will be denied with respect to the FMLA retaliation claim.

### C.  Punitive Damages

Defendant seeks to strike Plaintiff's request for punitive damages  on the grounds that there is no support the conclusion that Defendant conduct was especially egregious and malicious.  As an initial matter, punitive damages are unavailable under the FMLA. See Santosuosso v. NovaCare Rehabilitation, 462 F. Supp. 2d 590, 600-01 (D.N.J. 2006). Under the NJLAD, punitive damages are reserved for punishment and deterrence of "especially egregious" behavior.  Lehmann, 132 N.J. at 624.  A claim for punitive damages requires "actual participation in or willful indifference to the wrongful conduct on the part of upper management" and "proof that the offending conduct [is] 'especially egregious.'"  Cavuoti v. New Jersey Transit, 161 N.J. 107, 113 (1999). Therefore, punitive damages "are only to be awarded in exceptional cases even where

the [NJLAD] has been violated." <u>Catalane v. Gilian Instrument Corp.</u>, 271 N.J. Super. 476, 501 (N.J. Super. App. Div. 1994).

Defendant argues simply that the record is devoid of an egregious behavior on behalf of Defendant.  (Def.'s Br., p. 29-30.)  Plaintiff argues that he has "presented a genuine issue of material fact as to whether Alt's conduct exhibited the requisite evil intent or reckless or callous indifference to his statutorily protected rights to award punitive damages in this case."  (Pl.'s Br., p. 36.)

Genuine issues of material fact exist as to the sincerity of Defendant's position that Plaintiff must be available to work in excess of eight hours a day that preclude the Court from ruling at this time that, as a matter of law, punitive damages are not appropriate.  Therefore, Defendant's request to strike punitive damages will be granted with respect to Plaintiff's FMLA claim and denied with respect to Plaintiff's NJLAD claim.

## IV. CONCLUSION

For the reasons stated herein and on the record during oral argument, Defendant's Motion for Summary Judgment will be granted in part and denied in part. With respect to Plaintiff's NJLAD claims (Counts One through Four), Defendant's motion will be granted as to the hostile work environment claim (Count One) and retaliation claim (Count Three) and denied as to the failure to accommodate claim (Count Two) and termination claim (Count Four).  With respect to Plaintiff's FMLA claims (Count Five), Defendant's motion will be granted with respect to the interference claim and denied with respect to the retaliation claim.  With respect to Plaintiff's

requests for punitive damages, Defendant's motion will be granted as to Plaintiff's

FMLA claims and denied as to Plaintiff's NJLAD claims.  An appropriate Order will

follow.


Dated: August 3rd, 2011


                                        /s/ Joseph H. Rodriguez
                                        Hon. Joseph H. Rodriguez,
                                        United States District Judge